OPINION
{¶ 1} Plaintiffs-appellants, Davis Meyer Law, Ltd. ("Davis Meyer Law"), and Murray Title Agency, L.L.C., d/b/a Lakeshore Title Agency ("Lakeshore Title"), appeal from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, ProNational Insurance Company ("ProNational"). For the reasons that follow, we affirm the judgment of the trial court. *Page 2 
 {¶ 2} ProNational is a Michigan corporation that sells professional liability insurance policies to law firms, title agencies, and other professional entities throughout the midwest, including Ohio and Illinois. It is undisputed that attorneys Murray Davis and Jeff Meyer own Davis Meyer Law. Mr. Davis and Mr. Meyer also owned and operated Lakeshore Title, which conducted business near Chicago, Illinois. Plaintiffs were insureds under a professional liability policy issued by ProNational. In May 2003, Lakeshore Title was sued in Cook County, Illinois by Normal Campbell, individually and on behalf of a class of persons, who asserted claims of unjust enrichment and violations of the Illinois Consumer Fraud Act (the "Campbell lawsuit"). The complaint in the Campbell lawsuit alleged that Lakeshore Title charged excessive fees for courier services and county recording fees in connection with real estate transactions.
 {¶ 3} In August 2003, ProNational agreed to pay $180 per hour for the services of the law firm Piper Rudnick for its representation of Lakeshore Title in the Campbell lawsuit. Because Piper Rudnick's hourly rate was $340 to $540 per hour, it was agreed that plaintiffs would pay the remainder. But, on December 19, 2003, ProNational sent a letter to Mr. Meyer informing him that, as of that date, it would not pay any additional fees, costs, or expenses relating to the insured's defense in the Campbell lawsuit. In total, ProNational paid more than $40,000 to Piper Rudnick for its representation of Lakeshore Title.
 {¶ 4} On October 28, 2004, Lakeshore Title and Normal Campbell, individually and on behalf of the class members, reached a class settlement agreement, in which Lakeshore Title denied liability to Mr. Campbell and the class, but agreed to pay $200,000 *Page 3 
into a settlement fund, $200,000 in future credits in closing transactions, and attorney fees. The final approval order was filed April 8, 2005, in Cook County, Illinois.
 {¶ 5} Before the settlement, in June 2004, plaintiffs Davis Meyer Law and Lakeshore Title filed a complaint against ProNational and Insurance Office of Central Ohio in the Franklin County Court of Common Pleas, seeking declaratory judgment and alleging breach of contract, bad faith, and negligence. Plaintiffs alleged entitlement to insurance coverage in the Campbell lawsuit pursuant to the policy issued by ProNational.
 {¶ 6} In November 2005, ProNational moved for summary judgment in the Franklin County case. ProNational argued that it did not have a duty to defend and indemnify Lakeshore Title in the Campbell lawsuit. ProNational asserted that the Campbell lawsuit involved the claim that Lakeshore Title was unjustly enriched and a request for the return of money misrepresented as fees and costs. ProNational argued that the dispute over fees is not covered under the policy of insurance. Additionally, ProNational argued that there is no duty to defend or indemnify when a lawyer is sued for fraudulent acts. In its memorandum in support of its motion for summary judgment, ProNational specifically asserted: "Billing a client, or in this case a homeowner for recording fees and costs is not a professional service."
 {¶ 7} In their memorandum in opposition to ProNational's motion, plaintiffs argued that the "damages" exclusion does not apply to Lakeshore Title, that the ambiguities in the policy must be resolved against the insurer, and that ProNational is estopped from denying coverage.
 {¶ 8} In its decision on ProNational's motion, the trial court determined that Lakeshore Title's actions, which were the subject of theCampbell lawsuit, were not *Page 4 
covered under the policy because they did not constitute "professional services," as defined in the policy. Additionally, the trial court determined that, even if the claim in the Campbell lawsuit did fall under the definition of "professional services," it would be excluded under the fraud/bad faith exclusion in the policy. The trial court further determined that no genuine issue of material fact remained regarding the applicability of the equitable estoppel doctrine. The trial court concluded that no genuine issue of material fact exists for trial, that reasonable minds can come to but one conclusion, which is adverse to plaintiffs, and that ProNational is entitled to judgment as a matter of law.
 {¶ 9} Accordingly, on June 14, 2006, the trial court filed an entry sustaining ProNational's motion for summary judgment and dismissing plaintiffs' claims against ProNational. In said entry, the trial court noted that defendant Insurance Office of Central Ohio remains a party to the case; however, it expressly found that there was no just cause to delay an appeal of its decision. Plaintiffs appeal from that judgment and set forth the following five assignments of error for our review:
Assignment of Error 1
 The Trial Court Erred In Granting ProNational's Motion For Declaratory Judgment Based On A Finding That Lakeshore Title's Activities, As Alleged In The Normal Campbell Complaint, Did Not Constitute "Professional Services."
 Assignment of Error 2
 The Trial Court Erred In Concluding That Even If The Claim Did Not Fall Under The Definition Of Professional Services, It would Be Excluded Under The Fraud/Bad Faith Exclusion.
 Assignment of Error 3
 The Trial Court Erred In Concluding That The Claim Came Under The Fraud/Bad Faith Exclusion And Not Proceeding to *Page 5 
Consider Other Provisions Of The Policy, Including The Innocent Insured Provisions.
 Assignment of Error 4
 The Trial Court Erred In Failing To Apply Policy Language Imposing A Duty To Defend Which Precluded The Insurer From Withdrawing From The Defense Of The Normal Campbell Case.
 Assignment of Error 5
 The Trial Court Erred In Not Finding That Plaintiffs Established Genuine Issues Of Material Fact With Respect To Plaintiff's Claims That ProNational Accepted Defense Of The Normal Campbell Litigation Without Reservation Of Rights And Was Estopped From Denying Plaintiffs A Defense.
 {¶ 10} By their first assignment of error, plaintiffs allege that the trial court erred in granting summary judgment[1] based on the finding that Lakeshore Title's activities, as alleged in the Normal Campbell complaint, did not constitute "professional services." Specifically, plaintiffs claim that the following finding of the trial court was in error: "The act of billing clients for Recorder or courier services is not a service `performed by an Insured for others for a fee.' The Court therefore finds that the actions undertaken by Plaintiff do not fall under the definition of `Professional Services.'" (May 18, 2006 Decision, at 8.)
 {¶ 11} Appellate review of a trial court's granting of summary judgment is de novo. Mitnaul v. Fairmount Presbyterian Church,149 Ohio App.3d 769, 2002-Ohio-5833, at ¶ 27. Summary judgment is proper when a movant for summary judgment demonstrates that: (1) no genuine issue of material fact exists; (2) the movant is entitled to judgment as *Page 6 
a matter of law; and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56; State exrel. Grady v. State Emp. Relations Bd., 78 Ohio St.3d 181, 183,1997-Ohio-221. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359.
 {¶ 12} Under Civ.R. 56(C), a movant bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. In other words, the burden of demonstrating an entitlement to summary judgment rests with the moving party who must direct the court's attention to properly admissible evidence which demonstrates that the nonmoving party cannot support his or her claim or defense. Once a movant discharges its initial burden, summary judgment is appropriate if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial.Dresher, at 293; Vahila v. Hall (1997), 77 Ohio St.3d 421, 430; Civ.R. 56(E).
 {¶ 13} In support of their first assignment of error, plaintiffs contend that ProNational did not argue in its motion for summary judgment that the actions alleged in the Campbell lawsuit did not constitute "professional services." Thus, according to plaintiffs, the trial court should have permitted the parties to brief the issue prior to rendering a decision on the matter. To the contrary, ProNational's memorandum in support of its motion for summary judgment stated, in part, that "[b]illing a client, or in this *Page 7 
case a homeowner for recording fees and costs is not a professional service. * * * The Campbell lawsuit therefore fails to trigger the duty to defend or indemnify." Id. at 17. Thus, ProNational raised, in the trial court, the issue of whether the actions alleged in theCampbell lawsuit constituted "professional services" under the policy at issue.
 {¶ 14} Also in support of their first assignment of error, plaintiffs argue that the trial court failed to consider the policy in its entirety and that the trial court erroneously construed the "professional services" language of the policy. Specifically, plaintiffs contend that the trial court erroneously construed the "professional services" language of the policy too narrowly so as to exclude the activity alleged in the Campbell lawsuit.
 {¶ 15} "The interpretation of an insurance policy is a question of law that an appellate court reviews de novo, without deference to the trial court." Blair v. Cincinnati Ins. Co., 163 Ohio App.3d 81,2005-Ohio-4323, at ¶ 8, citing Nationwide Mut. Fire Ins. Co. v. GumanBros. Farm (1995), 73 Ohio St.3d 107, 108. When the language of an insurance policy is clear and unambiguous, the policy must be enforced as written, with the words given their plain and ordinary meaning.Cincinnati Indemn. Co. v. Martin (1999), 85 Ohio St.3d 604, 607, citingHybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd. (1992),64 Ohio St.3d 657, 665. The test for whether language in an insurance policy is ambiguous is whether the language is "reasonably susceptible of more than one interpretation." King v. Nationwide Ins. Co. (1988),35 Ohio St.3d 208, syllabus. "`Where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.'" Clark v. Scarpelli (2001), 91 Ohio St.3d 271, 282, quotingKing, at the syllabus. *Page 8 
 {¶ 16} Regarding coverage, the insurance policy in dispute in this case provides, in pertinent part, as follows:
 We will pay on behalf of the Insured all sums * * * which the Insured shall become legally obligated to pay as damages because of any claim or claims * * * during the policy period, arising from any act, error or omission which first occurred on or after the Retroactive Date * * * in rendering or failing to render professional services and caused by the Insured or by any person for whose acts, errors or omissions the Insured is legally liable[.]
 {¶ 17} Thus, the policy covers damages arising from the "rendering or failing to render professional services." (Emphasis added.) Pursuant to an endorsement to the policy, the term "professional services" is defined as follows:
 Professional Services means services rendered by an Insured in a lawyer-client relationship as a lawyer, mediator, arbitrator, notary public, administrator, conservator, receiver, executor, guardian, trustee, or in any similar fiduciary capacity. Professional services also means services (including title opinions or title certifications) performed by an Insured for others for a fee as a title insurance agent, title abstractor, title searcher, escrow agent, or closing agent. Professional services shall also include activities of an Insured as a member of a formal accreditation, ethics, peer review, licensing board, standards review, bar association or similar professional board or committee.
 {¶ 18} Plaintiffs assert that the use of the term "professional services" in the policy is intended to provide broad coverage because the language used to define the term is "broad, and non-restrictive." (Plaintiff's merit brief, at 12.) Additionally, plaintiffs argue that the term "professional services" in the policy is ambiguous. Plaintiffs contend that the ambiguity resulted from ProNational's "misguided attempt to use a modified legal malpractice policy to provide coverage for a title insurance agency." (Plaintiffs' merit brief, at 14.) *Page 9 
 {¶ 19} In support of these arguments, plaintiffs cite to deposition testimony regarding the drafting of the endorsement language, which, according to plaintiffs, the trial court did not adequately consider. Specifically, plaintiffs argue that the position taken by the trial court conflicts with the view of the person who assisted in the drafting of the endorsement language, Pam Allen. Plaintiffs also cite to deposition testimony of Mark Bush, who provided counsel to ProNational regarding whether the Campbell lawsuit was covered under the policy issued to plaintiffs. Plaintiffs seem to argue that the deposition testimony somehow creates or demonstrates an ambiguity in the policy as to the scope of coverage.
 {¶ 20} Plaintiffs' reliance on the deposition testimony in support of their interpretation of the language in the policy is misplaced, as the interpretation of an insurance policy is a question of law. SeeBlair, supra. We find that the policy provides a clear and detailed definition for the term "professional services." Thus, we conclude that plaintiffs have not cited any language in the policy that is reasonably susceptible of more than one interpretation. Therefore, we further conclude that plaintiffs' argument that the policy is ambiguous is unpersuasive.
 {¶ 21} As noted above, plaintiffs take issue with the trial court's conclusion that "[t]he act of billing clients for Recorder or courier services is not a service `performed by an Insured for others for a fee.'" Plaintiffs contend that the trial court's conclusion neglects to consider that "these functions and the charges associated with them are part of the standard day-to-day activity of a title insurance agency." (Plaintiffs' merit brief, at 17.) Similarly, plaintiffs argue that the trial court's interpretation of the policy is unreasonable insofar as it limits the scope of "professional services rendered for a fee" to *Page 10 
exclude the "normal ministerial activities of a title insurance agency such as charging fees for services provided to record or deliver documents." (Plaintiffs' merit brief, at 14.) In addition, plaintiffs assert that "billing clients" was not the primary focus of the alleged activity in the Campbell lawsuit; according to plaintiffs, the issue was whether the charges were excessive or resulted in unjust enrichment to the title company because the actual fees paid were less than what was shown on the closing statement and no refund was provided to the customer.
 {¶ 22} Contrary to plaintiffs' assertion, we find that the primary focus of the Campbell lawsuit was Lakeshore Title's alleged excessive charging for courier services and county recording fees. In addition, plaintiffs' argument that the trial court misconstrued the language of the policy relies on the idea that the act of billing is an integral part of the proper operation of a title insurance agency. Certainly, the act of billing could be viewed as part of the normal activities of a title insurance agency and even fundamental to its operation as a business entity. But that does not place the activity of collecting fees associated with recording and courier services within the realm of covered activity under the insurance policy. By its terms, the policy does not cover all necessary and/or important activities of a title insurance agency. We resolve that the act of billing or charging clients for ministerial, or non-ministerial activities, is not a service "performed by an Insured for others for a fee," and thus does not fit the definition of "professional services" under the policy.
 {¶ 23} Accordingly, we overrule plaintiffs' first assignment of error.
 {¶ 24} Plaintiffs' second assignment of error alleges that the trial court erred in concluding that, even if the claim in theCampbell lawsuit did not fall under the definition *Page 11 
of "professional services," it would be excluded under the fraud/bad faith exclusion. Clearly, plaintiffs intended to argue that the trial court erred in finding that, even if the claim did fall under the definition of "professional services," it would be excluded under the fraud/bad faith exclusion. Under their third assignment of error, plaintiffs allege that, even assuming arguendo the fraud exclusion does apply, other provisions in the policy should have been considered, namely the "Innocent Insured" clause in the policy, which is an exception to the fraud exclusion.
 {¶ 25} We find that it is unnecessary in this appeal to reach the issue of the applicability of the fraud/bad faith exclusion, or whether an exception to that exclusion applies, considering our resolution of plaintiffs' first assignment of error. Regarding plaintiffs' first assignment of error, we have determined that the trial court did not err in finding no coverage on the basis that the actions alleged in theCampbell lawsuit did not constitute "professional services," as that term is defined in the policy. Therefore, plaintiffs' second and third assignments of error are moot.
 {¶ 26} In their fourth assignment of error, plaintiffs argue that the trial court failed to apply policy language that allegedly imposed a duty to defend in the Campbell lawsuit. Thus, according to plaintiffs, ProNational was precluded from withdrawing its defense in that matter. In support of their fourth assignment of error, plaintiffs quote the following provision in the policy:
2.1 DUTY OF DEFENSE
 2.1 The Company has the exclusive right to investigate and settle claims and we will defend, subject to and as part of the limit of liability, any suit seeking damages against the Insured to which this policy applies, even if the allegations of the suit are groundless, false or fraudulent. * * * *Page 12 
 {¶ 27} Plaintiffs also argue under their fourth assignment of error that they were disadvantaged by ProNational's actions as to providing a defense in the Campbell case. According to plaintiffs, ProNational's cessation of providing for a defense "left Plaintiffs in an untenable position leading to a disadvantageous and unnecessary settlement of the underlying action." (Plaintiffs' merit brief, at 26.) Because this argument concerns ProNational's decision to cease providing for a defense for Lakeshore Title after it essentially assured plaintiffs that coverage would be provided for the claim's duration, it will be addressed in connection with plaintiffs' fifth assignment of error.
 {¶ 28} As to plaintiffs' argument that ProNational had a duty to provide for a defense, we note that an insurer's duty to defend is broader than and distinct from its duty to indemnify. SeeSocony-Vacuum Oil Co. v. Continental Cas. Co. (1945), 144 Ohio St. 382, paragraph one of the syllabus; Erie Ins. Exchange v. Colony Dev.Corp. (1999), 136 Ohio App.3d 406. See, also, Westfield Natl. Ins. Co.v. Safe Auto Ins. Co., Franklin App. No. 06AP-739, 2007-Ohio-2469, at ¶ 14 (recognizing the general proposition that an insurer's duty to defend is broader than its duty to indemnify). An insurer need not defend any action or any claims within the complaint when all the claims are clearly and indisputably outside of the contracted policy coverage.Cardiothoracic Vascular Surgical Specialists, Inc. v. TravelersIndemn. Co., Franklin App. No. 05AP-1355, 2006-Ohio-6947, at ¶ 21, citing Preferred Risk Ins. Co. v. Gill (1987), 30 Ohio St.3d 108, 113.
 {¶ 29} Plaintiffs' argument that ProNational had a duty to provide a defense for Lakeshore Title in the Campbell matter is not persuasive. In the Campbell lawsuit, it was alleged that Lakeshore Title charged and collected excess fees for recording and courier *Page 13 
services. Such alleged activities clearly and indisputably are not covered under the pertinent policy of insurance. Therefore, ProNational was not required to accept the defense of the claim.
 {¶ 30} Accordingly, we overrule plaintiffs' fourth assignment of error.
 {¶ 31} Plaintiffs' fifth assignment of error alleges that the trial court erred in not finding that plaintiffs established a genuine issue of material fact as to their claim that ProNational accepted its defense in the Campbell lawsuit and was estopped from subsequently denying coverage. Plaintiffs argue that the trial court failed to construe the facts most strongly in their favor when it ruled upon ProNational's motion for summary judgment.
 {¶ 32} As outlined above, ProNational initially provided coverage when it was informed of the Campbell lawsuit in June 2003. By August 2003, ProNational agreed to pay for the services of the law firm of Piper Rudnick at a rate of $180 per hour for its representation of Lakeshore Title in the Campbell lawsuit, even though ProNational initially intended to retain the law firm of Lord Bissell Brook. However, in December 2003, ProNational informed Mr. Meyer that ProNational would no longer pay for a defense or provide indemnification as to any settlement, verdict, or judgment in the Campbell lawsuit. Plaintiffs argue that ProNational's initial agreement to provide a defense, and subsequent refusal to provide a defense, prejudiced plaintiffs by forcing them to enter into a "disadvantageous settlement of a meritless claim." (Plaintiffs' reply brief, at 12.) Plaintiffs argue that ProNational has waived its ability to deny coverage, and, alternatively, must be estopped from denying coverage. *Page 14 
 {¶ 33} "[A] general rule exists which prohibits estoppel and waiver from expanding the coverage of an insurance policy. However, an exception also seems to have developed which allows estoppel and waiver to be asserted when an insurer provides a defense to its insured without reserving its rights to assert a policy defense." Turner Liquidating Co.v. St. Paul Surplus Lines Ins. Co. (1994), 93 Ohio App.3d 292, 297. "Waiver and estoppel should apply only in those cases where there is a clear misrepresentation of fact or when the insurer provides a defense without reserving its rights for a period sufficient to prejudice the insured's ability to conduct its own defense." Id. at 299. "[T]he doctrine of equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good faith reliance upon the party's conduct." Id. at 295, citing State ex rel. Cities Serv. v. Orteca (1980), 63 Ohio St.2d 295,299. "If [a court] were to flatly find that estoppel was not available to extend the coverage of an insurance company, there may be no recourse for an insured whose insurer withdraws its defense the day before trial." Id. at 299-300.
 {¶ 34} Considering the foregoing, we find that for the exception to the general rule to apply here, plaintiffs, at a minimum, needed to demonstrate that their rights were prejudiced by the actions or statements of ProNational regarding the defense of Lakeshore Title in the Campbell lawsuit. In that regard, plaintiffs argue that the affidavit of Mr. Meyer creates an issue of fact as to whether plaintiffs detrimentally relied upon ProNational's assurance that it would provide support for the duration of the Campbell matter.
 {¶ 35} As a preliminary matter, we find that it does appear that the trial court assessed the credibility of the statements made in Mr. Meyer's affidavit when it stated in *Page 15 
its decision that Mr. Meyer's assertion that he would have engaged counsel at a lower rate and would have agreed to settle the case earlier "is belied by the fact that Plaintiffs retained Piper even after ProNational indicated that it would retain Lord Bissell Brook." (Emphasis added.) (May 18, 2006 Decision, at 12.) Thus, the trial court took notice that Mr. Meyer's assertion was inconsistent with the evidence that plaintiffs initially requested Piper Rudnick for purposes of the Campbell lawsuit. The trial court determined that Mr. Meyer's assertion does not show that genuine issues of material fact remain.
 {¶ 36} When ruling upon a motion for summary judgment, a court does not consider the weight of the evidence or the credibility of the witnesses. Santho v. Boy Scouts of America, 168 Ohio App.3d 27,2006-Ohio-3656, at ¶ 16. The issue in the summary judgment context is whether there is sufficient evidence to create a genuine issue for a jury to decide. Id. Although it was inappropriate for the trial court to assess the credibility of a statement made by an affiant, we review the trial court's decision to grant summary judgment de novo. Thus, that inappropriate credibility assessment is not per se reversible error.
 {¶ 37} In this appeal, we must determine whether a genuine issue of material fact exists as to whether plaintiffs detrimentally relied upon actions or statements of ProNational regarding Lakeshore Title's defense in the Campbell lawsuit. As noted above, plaintiffs argue that Mr. Meyer's affidavit creates a genuine issue of material fact. ProNational contends that, even if the statements in Mr. Meyer's affidavit are assumed to be true, plaintiffs' argument fails. In pertinent part, Mr. Meyer's affidavit states as follows:
 Affiant states that after he received the coverage denial letter of December 19, 2003, he gave immediate consideration to changing counsel to reduce legal fees and expenses and to *Page 16 
pursue prompt settlement of the sole remaining claim. The decision to pursue settlement was for purely economic reasons, because the defense to date had cost in excess of $90.000.00 in approximately six months. Settlement was achieved with new counsel at a cost to Plaintiff $200,000 cash, plus an additional $200,000.00 in future credits and legal fees.
 [H]ad ProNational denied coverage at the outset, Affiant would have engaged counsel at a lower hourly rate, as Attorney Fowerbaugh agreed to a reduced rate substantially below the Piper, Rudnick rate, and would have immediately pursued settlement in order to avoid substantial legal fees. Alternatively, Affiant would have considered and pursued either closing the business or exploring bankruptcy protection proceedings for Lakeshore Title.
Id. at 5.
 {¶ 38} The trial court determined that plaintiffs failed to demonstrate how any reliance on statements by ProNational was detrimental to plaintiffs. We agree with the trial court's assessment. Even construing the evidence most strongly in favor of plaintiffs, we agree with the trial court and find that no genuine issue of material fact was created by Mr. Meyer's affidavit.
 {¶ 39} Regarding the issue of plaintiffs' alleged detrimental reliance, we initially note that plaintiffs received the benefit of payments made by ProNational for purposes of Lakeshore Title's defense in the Campbell lawsuit. ProNational paid $180 per hour for the services of Piper Rudnick in the representation of Lakeshore Title in theCampbell lawsuit. For services provided before ProNational issued the denial of coverage letter in December 2003, ProNational paid over $40,000 to Piper Rudnick relating to Lakeshore Title's defense. Plaintiffs received the significant financial benefit, even though, under the terms of the policy, ProNational was not obligated to provide for that defense. *Page 17 
 {¶ 40} In addition, plaintiffs received the counsel they requested for that representation. On May 31, 2003, Mr. Meyer emailed Francie Kuntz, of the Insurance Office of Central Ohio, indicating that he had already discussed the Campbell lawsuit with the law firm of Piper Rudnick, and he requested that ProNational consider using said firm to handle the defense in the Campbell lawsuit case. On June 3, 2003, ProNational learned of the lawsuit against Lakeshore Title, and, approximately two weeks later, Mr. Meyer e-mailed JoAnn Hathaway, of ProNational, indicating that he had discussed the lawsuit with attorneys at Piper Rudnick, "and respectfully requested] that ProNational consider utilizing this firm due to its expertise in this area of law and its experience with the plaintiff's counsel." In August 2003, the parties agreed to retain Piper Rudnick for Lakeshore Title's representation in the Campbell lawsuit.
 {¶ 41} To the extent Mr. Meyer's affidavit indicates that, had ProNational initially denied coverage, plaintiffs would have immediately pursued settlement, we resolve that that assertion does not provide evidence that plaintiffs detrimentally relied upon ProNational's initial assurance that it would provide for a defense. Simply because Mr. Meyer asserts that he would have pursued settlement earlier does not indicate that plaintiffs would have obtained a more favorable settlement, or could have even settled earlier. One would be left to speculate as to whether a more favorable settlement for Lakeshore Title could have been reached earlier, or what the terms of that settlement would have been. Most simply, the terms of any earlier settlement, and when that settlement would have occurred, is pure speculation. Similarly, Mr. Meyer's assertion that he would have considered and pursued either closing the business or exploring *Page 18 
bankruptcy protection proceedings for Lakeshore Title is not sufficient to create a genuine issue of fact for a jury to resolve.
 {¶ 42} Additionally, to the extent Mr. Meyer's affidavit indicates that, had ProNational initially denied coverage, he would have retained different counsel at a lower hourly rate, we find that that assertion also does not demonstrate detrimental reliance. Mr. Meyer's affidavit could be construed to assert that he decided not to retain Attorney Fowerbaugh, who apparently agreed to a "reduced rate substantially below the Piper, Rudnick rate," because ProNational indicated that it would provide coverage. Mr. Meyer's affidavit seems to imply that plaintiffs' legal fees associated with the Campbell lawsuit would have been reduced had ProNational initially denied coverage because he would have retained different counsel at a lower hourly rate.
 {¶ 43} Even if Mr. Meyer had initially retained Fowerbaugh, of Lord Bissell Brook, there is no indication from a review of the record that plaintiffs' legal fees and expenses would have been lower than what they were with the legal representation of Piper Rudnick. The representation of Lakeshore Title in the Campbell lawsuit was subsidized by ProNational at a rate of $180 per hour, and the lowest rate indicated in the record for the services of Lord Bissell Brook attorneys is $230 per hour. Thus, for Mr. Meyer's position to hold true, Piper Rudnick would have had to bill at an average rate of more than $410 per hour. Based on our review of the Piper Rudnick invoices in the record, we find that, with respect to the pertinent period of time, Piper Rudnick charged an average of approximately $382 per hour for the legal services of their attorneys in the Campbell lawsuit. Moreover, Mr. Meyer's affidavit does not consider the potential differences in other factors necessarily relating to the value of services of different lawyers, including the *Page 19 
amount of time required to properly prepare for trial and/or position the party for settlement. Nor does Mr. Meyer's affidavit consider potential variations in expenses related to such things as paralegal work or electronic research costs.
 {¶ 44} Lastly, plaintiffs point to the fact that they pursued other counsel after ProNational sent the denial letter in December 2003 in support of their detrimental reliance argument. We resolve that the fact that plaintiffs, at some point, retained new counsel after ProNational sent the coverage denial letter in December 2003, and settled theCampbell lawsuit with that new counsel, does not demonstrate any prejudice. There is no indication that the timing of the denial of coverage disadvantaged Lakeshore Title in the preparation of its defense in the Campbell lawsuit, or in positioning itself for settlement.
 {¶ 45} Based on the foregoing, we find no genuine issue of material fact as to whether plaintiffs detrimentally relied upon ProNational's statements or actions regarding Lakeshore Title's defense in theCampbell lawsuit. Most simply, we find nothing in the record sufficiently demonstrating that plaintiffs were placed in a worse position because it relied upon ProNational's initial decision to provide a defense. Thus, we conclude that the trial court correctly determined that there is no genuine issue of material fact for a jury to resolve, that reasonable minds can come to but one conclusion, which is adverse to plaintiffs, and that ProNational is entitled to judgment as a matter of law. Therefore, we overrule plaintiffs' fifth assignment of error.
 {¶ 46} In sum, we overrule plaintiffs' first, fourth, and fifth assignments of error. Our resolution of plaintiffs' first assignment of error renders moot plaintiffs' second and *Page 20 
third assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
SADLER, P.J., and KLATT, J., concur.
[1] Although ProNational's motion was titled "Defendant, ProNational Insurance Company's Motion for Declaratory Judgment," the trial court construed it as a motion for summary judgment. *Page 1